# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JEREMY DIAL,                  :
:
       Plaintiff,           :
:
v.                        :       CIVIL ACTION NO.
:       1:10-CV-2305-RWS
ROCKDALE COUNTY, *et al.*,   :
:
       Defendants.      :
:

## ORDER

This case comes before the Court on Defendants Sunny Goodson, Jason Griffin, Newton County, Joe Nichols, and Marty Roberts' (collectively, "Newton County Defendants") Motion for Summary Judgment [37], and Defendants Rockdale County and Jeff Wigginton's Motion for Summary Judgment [42]. After a review of the record, the Court enters the following order.

## I. Factual Summary

Considering the facts in the light most favorable to the Plaintiff, the following occurred:

Plaintiff Jeremy Dial ("Dial") began working as a sworn detention officer for the Newton County Sheriff's Office ("NCSO") in August 2003. Pl.'s Resp. SMF, Dkt. No. [52-7] at ¶ 1. As a Newton County detention officer, Dial had an affirmative duty to report criminal matters as a part of his oath of office. Id. at ¶ 75. Dial resigned his initial detention officer position after being arrested on unrelated charges, but then reapplied and began working for the NCSO again in August 2008. Id. at ¶ 2. In September 2008, Dial took medical leave from the NCSO to recover from knee surgery. Id. at ¶ 3. As a part of his knee-surgery recovery, Dial had been prescribed a prescription pain-medication, Percocet. Id. at ¶ 4.

On September 22, 2008, Dial claims that his best friend, Marcus Marion, confessed to Dial that Marion had strangled a young woman to death, wrapped her body in plastic, and dumped her in a creek bed behind a local apartment complex. Id. at ¶¶ 5, 8. Dial did not immediately report this information to the authorities. Id. at ¶ 9. Rather, several hours later Dial called his father, Greg Dial, for advice, as Greg had worked for the NCSO from 1995 to 2006. Id. at ¶¶ 7, 10. Dial told Greg that he "didn't know what to do" and that he did not know if what Marion had told him was true. Dial expressed concern that did not want

to destroy a life-long friendship if Marion was "just running his mouth" and it was not actually true. Greg Dep., Dkt. No. [44] at 27:18-28:3. During the call, Greg noticed that Dial was clearly on pain medication. Dkt. No. [52-7] at ¶ 11.

Dial then drove to his father's house to discuss the matter further. Id. at ¶ 13. There, Greg directed Dial to contact Investigator Gene Higdon of the Rockdale County Sheriff's Office ("RCSO"). Id. at ¶ 14. However, Dial did not immediately do so and instead went home and went to sleep. Id. at ¶ 15. Plaintiff now concedes that he should have called Higdon before going home. Id. at ¶ 16. Additionally, Plaintiff admits that his failure to immediately report the possible crime could appear that he was trying to protect his friend, and he recognizes that it is critically important to begin a murder investigation as soon as possible to avoid evidence spoliation or flight by the murderer. Id. at ¶¶ 17, 18.

The next day, Plaintiff woke up and took Percocet. Id. at ¶ 19. He then got into the car and headed toward the RCSO. Id. at ¶ 20. As he was driving, Dial called Higdon and told him that he had information about a possible murder and suggested that they meet at Burger King. Id. at ¶ 21. At Burger King, Dial told Higdon that his friend had confessed to murder, but Dial would

AO 72A
(Rev.8/82)

not give Higdon any information regarding his own identity or Marion's identity. Id. at ¶¶ 24, 26. But Dial told them that if they checked the alleged dump site and found that a crime had been committed, he would take the RCSO officers to his friend's location. Dkt. No. [43] at 100:13-22. As Dial was leaving, Higdon wrote down Dial's license plate number so that he could identify him through other means. Dkt. No. [52-7] at ¶ 25.

Later that day, Rockdale County Sheriff Jeff Wigington called Newton County Sheriff Joe Nichols regarding Dial. Id. at ¶ 30. Wigington told Newton about Higdon's encounter with Dial, and that Dial had not been forthcoming about the suspect's and his identities. Id. at ¶ 31.   Additionally, Wiginton told Nichols that he was "sending some people down to pick Jeremy up." Greg Dep., Dkt. No. [44] at 33; Pl.'s SMF, Dkt. No. [51-2] at ¶ 47. And Wigington asked Nichols if he would send NCSO officers along with his RCSO officers to meet with Dial. Dkt. No. [52-7] at ¶ 34. Per Wigington's request, Nichols instructed Captain Marty Roberts, Lieutenant Bill Waterson, Sergeant Sonny Goodson, and Officer Jason Griffin to accompany the RCSO officers. Id. at ¶ 36. Captain Roberts was Plaintiff's immediate supervisor. Id. at ¶ 38.

4

After leaving the Burger King, Plaintiff returned to his home, went upstairs to his television room, and put his gun in a holster on his hip. Id. at ¶¶ 42, 45. Dial's mother, Holly McCullough, soon came over to Dial's home to help take care of him since he was on crutches. Id. at ¶ 46. McCullough made Dial something to eat, and he took two more Percocet. Id. at ¶ 47. Dial then told her he was tired. Id. at ¶ 48.

About half an hour later, McCullough was about to leave Dial's home to refill his prescription when she opened the front door and found Roberts and Goodson on the porch. Id. at ¶¶ 49-50. Additionally, she noticed that there were several RCSO investigators that she did not recognize in the yard. Id. at ¶ 50. Roberts asked McCullough if Dial was home and stated that they needed to talk with him. Id. at ¶ 52. McCullough told the officers that Dial was not feeling well and had just taken his medication, but she told the officers to "hold on a minute" and then closed the door. Id. at ¶¶ 53-54. McCullough then went upstairs and told Dial that Roberts and several other officers were in the yard. Id. at ¶ 55.

Dial then slid down the stairs on his rear end, and when he reached the bottom, McCullough handed him his crutches. Id. at ¶ 59. Dial then opened the

AO 72A
(Rev.8/82)

door and stated, "why are you all at my fucking house?" Id. at ¶¶ 61, 63.

Roberts and Goodson then entered Plaintiff's home and Roberts stated, "we

need to talk." Id. at ¶ 64. Dial kept telling the Defendants, "y'all need to leave

my house. I will go and talk to you somewhere else." Dkt. No. [48] at 47:25-

48:4. At this time, the rest of the officers–all but Bill Waterson–came in the

house. Id. at 48:4-11; Dkt. No. [43] at 130:2-3. One of the officers then asked

Dial to remove his firearm and Plaintiff complied. Dkt. No. [52-7] at ¶ 71.The

officers then began yelling at Dial, and Roberts told Dial that he had to go with

them. Id. at ¶ 72; Dkt. No. [53-1] at ¶ 28. Dial protested. Dkt. No. [53-1] at ¶

28.

     During this exchange, McCullough called Greg and told him what was

happening. Dkt. No. [44] at 30:5-7. McCullough then called back and stated

that the officers were taking Dial from the house. Id. at 34:13-15. Greg called

Goodson and stated that he was on his way and asked if he (Greg) could take

Dial himself to Rockdale County. Id. at 36:3-12. Goodson then told Greg "just

to meet him at Rockdale." Id.

     Dial then walked and got into Roberts' unmarked vehicle under his own

power. Dkt. No. [52-7] at ¶ 80. During the drive to Rockdale County, Dial's

medication began to "kick-in" and he has large gaps in his memory about what happened after that point. Id. at ¶ 82. He does remember that Roberts warned him during the ride over that he might lose his job if he did not cooperate. Id. at ¶ 83. And only RCSO personnel interrogated him once they arrived. Id. at ¶ 86. While he has no personal recollection, Dial learned afterward that after several hours he eventually provided his friend's name. Id. at ¶ 87.

Dial then filed suit in this Court against the Defendants for violating his Fourth Amendment rights. Dkt. No. [1]. Each of the Defendants has moved for summary judgment. However, since the briefing is not completed as to Wolfe and Brewer, the Court will not consider their motion at this time.

## II. Discussion

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

AO 72A
(Rev.8/82)

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

8

<u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997) (quoting

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

"If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations

omitted); <u>see also</u> <u>Matsushita</u>, 475 U.S. at 586 (once the moving party has met

its burden, the nonmoving party "must do more than simply show there is some

metaphysical doubt as to the material facts").

     Plaintiff brings all of his claims pursuant to 42 U.S.C. § 1983, alleging

that the Defendants violated his Fourth Amendment rights. Section 1983

provides,

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress . . .

42 U.S.C. § 1983. "In order to prevail in a civil rights action under section

1983, 'a plaintiff must make a prima facie showing of two elements: (1) that the

act or omission deprived plaintiff of a right, privilege or immunity secured by

AO 72A
(Rev.8/82)

the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law.'" Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (emphasis added) (quoting Bannum, Inc. v. City of Ft. Lauderdale, 901 F.2d 989, 996-97 (11th Cir. 1990)). The Court will consider each claim in turn.

**B. Newton County, Rockdale County, and All Individual Defendants in Their Official Capacities**

As an initial matter, Plaintiff concedes that his claims are not proper against the counties in any capacity, whether through a direct action or through official-capacity suits against the individual defendants. Dkt. No. [52-1] at 15; Dkt. No. [51-1] at 7. Thus, Defendants' Motions for Summary Judgment [37, 42] are **GRANTED** on all claims against Newton and Rockdale Counties directly and all claims against the individual Defendants in their official capacities.

**C. Defendant Sheriff Nichols**

Defendant Sheriff Nichols next argues that Dial cannot mount a claim against him for supervisory liability as there is no evidence that Nichols instructed the other Newton County Defendants to violate Dial's rights. "It is

10

well established in [the Eleventh] Circuit that supervisory officials are not liable

under § 1983 for the unconstitutional acts of their subordinates on the basis of

*respondeat superior* or vicarious liability." Hartley v. Parnell, 193 F.3d 1263,

1269 (11th Cir. 1999) (internal quotation marks and citation omitted).

> Instead, supervisory liability under § 1983 occurs
> either when the supervisor personally participates in
> the alleged unconstitutional conduct or when there is a
> causal connection between the actions of a
> supervising official and the alleged constitutional
> deprivation.  The necessary causal connection can be
> established when a history of widespread abuse puts
> the responsible supervisor on notice of the need to
> correct the alleged deprivation, and he fails to do so.
> Alternatively, the causal connection may be
> established when a supervisor's custom or policy
> results in deliberate indifference to constitutional
> rights or when facts support an inference that the
> supervisor directed the subordinates to act unlawfully
> or knew that the subordinates would act unlawfully
> and failed to stop them from doing so.  The standard
> by which a supervisor is held liable in his individual
> capacity for the actions of a subordinate is extremely
> rigorous.

Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation

marks and citation omitted).

Plaintiff concedes that there "is no evidence the Defendants' actions were

the result of an established policy or practice." Dkt. No. [52-1] at 15. And there

11

is no evidence that Nichols personally participated in the offending conduct. Rather, Plaintiff argues that Nichols is liable because he directed his officers to "pick up Dial." Id. at 16. In reviewing the testimony which Plaintiff cites for this proposition, even taking the facts most favorably to the Plaintiff, the Court does not find that Greg's testimony supports such an inference.

To support his assertion, Dial cites his father's deposition testimony at page 36. That testimony stated:

> Q: Did Sonny tell you that they just wanted to talk about this alleged murder?
>
> A: Not that I recall. I did talk – after Holly called me and said that they were taking Jeremy to Rockdale, I called Sonny back and told him that I was on my way and asked him if I could bring Jeremy instead of them taking him. He asked someone in the background and I heard a voice say, no, he's going with us now. Sonny told me just to meet him at Rockdale. So they wanted to interview him, but I don't recall any statements to the fact – to the effect that they just want to talk to him.

Greg Dep., Dkt. No. [44] at 36:1-12. This testimony is clearly after Dial's home had been entered and creates no inference that Nichols directed this conduct, even if the statement that "he's going with us now" would be properly admissible as a statement by a party opponent. Thus, the only evidence before the Court as to Nichols' intentions is found in the Newton County Defendants'

affidavits wherein each affirms that Nichols only directed the officers to accompany the Rockdale officers to Dial's home and to "talk to Dial and find out the name of the suspect." Nichols Aff., Dkt. No. [37-6] at ¶ 5; Roberts Aff., Dkt. No. [37-7] at ¶ 5; Goodson Aff., Dkt. No. [37-8] at ¶ 5; Griffin Aff., Dkt. No. [37-9] at ¶ 5. As there is no evidence that Nichols directed the other Newton County officers to violate Dial's rights, the Newton County Defendants' Motion [37] is **GRANTED** as to Nichols.

### D. Defendants Roberts, Goodsen, and Griffen

#### 1. Constitutional Violation

Defendants Roberts, Goodsen, and Griffen–the on-scene Newton County Defendants–next move for summary judgment on Plaintiff's Fourth Amendment claim for a warrantless entry which led to a seizure. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Supreme Court has repeatedly stated that "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Payton v. New York, 445 U.S. 573, 585-86 (1980) (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)). "[A]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unwanted governmental intrusion. In terms that apply equally to seizure of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id. at 590 (internal quotations and citations omitted).

As a result of the foregoing policy, warrantless searches and seizures in a home are presumptively unreasonable. Id. at 586. "The presumption is rebutted, and the arrest lawful, only when some exception to the warrant requirement–such as consent or exigent circumstances–exist." Bates v. Harvey, 518 F.3d 1233, 1239 (11th Cir. 2008). As well, the warrant requirement is not vitiated even when the officer has probable cause or is acting under statutory authority. Id. at 1240. "Thus, to obtain qualified immunity from [Plaintiff's

14

claims, the Defendants] must demonstrate that [their] presence in the [Plaintiff's] home without a warrant was lawful or did not violate then-clearly established law." Id.

Defendants appropriately do not contend that they had consent to enter Dial's home. Rather, they argue that their actions were mitigated by the exigencies of the encounter. Specifically, Defendants argue that the Plaintiff was a "very real threat to officer safety" because "when Dial opened the door, he was immediately hostile and belligerent, under the influence of a powerful narcotic, and he was armed with a gun." Dkt. No. [37-1] at 28. However, taking the facts most favorable to the Plaintiff, the Court cannot find that a reasonable officer would have found Plaintiff to be a threat to the officers' safety.

Dial's mother, Holly McCullough, testified that the encounter occurred as follows: after Dial scooted his way downstairs, Dial opened the door and said, "Why are you all at my fucking house,"[1] and Goodson and Roberts "just came in. Jeremy had to back up on his crutches. I mean, [Goodson] just started walking in the door . . . And [Dial] said, What are you doing here? And

---

[1]McCullough testified that Plaintiff said, "What are y'all doing here." But, Plaintiff has admitted that he actually used the above-stated expletive in his initial encounter. Dkt. No. [52-7] at ¶ 63.

[Goodson] said, We need to talk to you. And [Dial says], You need to get the "F" off my property. I will come down the street to talk to you, but you do not need to be at my house." Dkt. No. [48] at 46-47. As well, Dial testified that Griffin also entered his home during the encounter. Dkt. No. [43] at 130:2-3.

Based on that testimony, the Court cannot find as a matter of law that a reasonable officer would have thought that he was in danger. Dial did not threaten the Defendants, and only stated "why are you all at my fucking house" before the officers entered the home. As well, Dial never took his gun out of its holster, surrendered the weapon when asked, and–according to the Defendants–Dial was not a suspect for a violent crime. At most, Plaintiff had committed obstruction of justice. Moreover, Dial was on crutches and would not have been able to run or pull his weapon without difficulty. Dial did not even try to end the conversation before the Defendants entered his home. While the Court admits this is a closer case because the Plaintiff had taken pain medication, because the officers entered the home immediately after Dial opened the door and asked them why they were there, the Court cannot find as a matter of law that exigent circumstances existed in this matter. Moreover, Dial testified that his medication had not taken effect yet when the officers first

16

arrived as the medication generally took an hour to "kick-in," and he had taken the medication shortly before Defendants arrived. Dkt. No. [43] at 125:24-126:1, 135:10-14.

Additionally, Defendants argue that they were in "hot pursuit" of the Plaintiff as the Rockdale officers had met with Dial earlier that morning. However, these circumstance did not constitute "hot pursuit." The Rockdale officers let Dial leave the Burger King and did not follow him. There is no evidence that Dial was a "fleeing suspect," a requirement of the hot-pursuit doctrine. See Kentucky v. Hollis, ___ U.S. ___, 131 S. Ct. 1849, 1856 (2011) ("Police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect.") (emphasis added); United States v. Santana, 427 U.S. 38, 43 (1976) ("hot pursuit means some sort of a chase"). Thus, the Court finds that Defendants cannot claim hot pursuit in this case.

Additionally, Defendants argue that Plaintiff was never seized. Dkt. No. [53] at 8-11. Defendants argue that "the officers did not touch him, put him in handcuffs, threaten to use force or draw their service weapons, search his house, tell him that he was under arrest, or read him his Miranda rights." Dkt. No. [37-1] at 21. However, the Court finds that considering the facts most favorably to

17

the Plaintiff, the Court cannot find that a reasonable person would not have found that he had been seized.

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Sanford, 658 F.2d 342, 344 (11th Cir. 1981). In United States v. Hammock, 860 F.2d 390, 393 (11th Cir. 1988), the Eleventh Circuit noted several factors which a court could consider in determining if an arrest had occurred. "These circumstances include the blocking of an individual's path or the impeding of his progress; the retention of a ticket or piece of identification; an officer's statement that the individual is the subject of an investigation, or that a truly innocent person would cooperate with the law enforcement officer; the display of weapons; the number of officers present and their demeanor; the length of the detention; and the extent to which the officers physically restrained the individual." Id.

Here, Plaintiff has presented evidence that six officers came to his house and five of those officers entered his home and remained in his home without consent. And Plaintiff's mother testified that the Plaintiff had to back-up

18

because the Defendants were entering his home. Plaintiff also testified that he

was told that he "had to go with them. I was telling [Roberts] that I didn't want

to go with them. Several of the other[ officers] chimed in that, you know, I had

to go. I remember one of the investigators from Rockdale, you know, giving me

some speech about I'm either a good guy or a bad guy and right now I'm being

an f'ing criminal and that I was not better than the rest of them." Dkt. No. [43]

at 136:23-137:4. Plaintiff also reported that Roberts was "heated," id. at 143:18,

and Plaintiff knew that his dad had told the officers that he would come and get

the Plaintiff, but the officers still told the Plaintiff that he had to go with them.

Id. at 141. Due to these facts, the Court cannot find as a matter of law that a

reasonable person could not have felt seized by the officers. Therefore,

Defendants' Motion is **DENIED** as to the Fourth Amendment claim against

Defendants Goodson, Roberts, and Griffin.[2]

---

[2]Because the Court finds that the Defendants did not have exigent
circumstances or consent, the Court declines to decide whether they had probable
cause to arrest Dial as whether they had probable cause does not affect summary
judgment in this case. See Bates, 518 F.3d at 1240.

### 2. Qualified Immunity

Defendants Goodson, Roberts, and Griffin next argue that even if they committed a constitutional violation, they are entitled to qualified immunity on that claim. Qualified immunity protects government officials performing discretionary functions from being sued in their individual capacities. Wilson v. Layne, 526 U.S. 603, 609 (1999). Public officials are shielded under qualified immunity so far as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is a question of law for the court. Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993).

The Eleventh Circuit utilizes a two-part analysis for the defense of qualified immunity. First, the defendant official must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Hartsfield v. Lemacks, 50 F.3d 950, 953 (11th Cir. 1995). If the defendant meets this burden, the plaintiff must then demonstrate that the defendant violated clearly established law based upon objective standards. Id.

AO 72A
(Rev.8/82)

Plaintiff concedes that the officers were acting within the scope of their discretionary authority. See Dkt. No. [52-1] at 6. Thus, the question is whether Defendants violated a clearly established right.

> The plaintiffs can demonstrate that the contours of the right were clearly established in several ways. First, the plaintiffs may show that "a materially similar case has already been decided." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir.2005) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982)). Second, the plaintiffs can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation." Id. (citing Hope, 536 U.S. at 741, 122 S. Ct. 2508). Finally, the conduct involved in the case may "so obviously violate[ ] th[e] constitution that prior case law is unnecessary." Id. (citing Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002)). Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [Georgia] Supreme Court. See id.

Terrell v. Smith, 668 F.3d 1244, 1255 (11th Cir. 2012).

Defendants argue that they did not have fair notice that they could not "enter the house of a material witness" or that they could not visit Plaintiff's home as his employer. Dkt. No. [53] at 14-15. However, the Court finds that there is no right more clearly established than the sanctity of the home, and it is abundantly clear that there are only two exceptions to that sanctity: consent and exigent circumstances. Payton, 445 U.S. at 585-86; Bates, 518 F.3d at 1239.

21

Defendants argue that because they could find no case which stated the bounds of "when an officer can enter the house of material witness, who is also a law enforcement officer and who poses a direct threat to [officer] safety, and then transport the witness for further questioning," they cannot be liable. Dkt. No. [37-1] at 36. The Court finds that there is an issue of fact as to whether Plaintiff was a direct threat and further finds this level of abstraction to be too specific. See Wilson v. Layne, 526 U.S. 603, 614 (1999) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."). The ultimate goal of the "clearly established" prong is to assure that the pre-existing lawfulness of the act was apparent. Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Here, the Court finds that the law is clear that a warrant is required to cross the threshold of a home, even when the officer has probable cause that the occupant has committed a crime. Defendant argues that because the Eleventh Circuit has recognized an exception to the Fourth Amendment for employment matters, the law is at least sufficiently unclear that Defendants' violation was not clearly established. In Reyes v. Maschmeier, 446 F.3d 1199, 1202 (11th Cir.

22

2006), the court found that a plaintiff had not stated a claim for a Fourth

Amendment violation when she alleged that her sergeant struck her in the back

of the head with a three-ring binder and berated her in his office for going home

early. The Circuit ruled that the plaintiff had not sufficiently plead that she was

"seized" because she did not present evidence that her movement was inhibited.

Id. at 1205. And plaintiff's version of the facts demonstrated that this was an

employment matter, not a law enforcement one. Id. at 1204. Interestingly, the

Court declined to decide whether the facts plead were "clearly established." Id.

at 1205.

The Court does not find that this case changes the Court's analysis. First,

this is a case in which the plaintiff failed to present evidence of a seizure.

Second, Reyes is a case about what the Circuit described as a "meeting"

attended by governmental employees. But most importantly, this did not occur

in the home. Courts have been very clear that there is a presumption that

entering a home without a warrant is unlawful. And courts have specifically

limited the exceptions to that rule. Taking the facts most favorable to the

Plaintiff, Defendants knew that they did not have consent or exigent

23

circumstances to support their actions. Thus, the Court finds that qualified immunity is not appropriate at this stage.

## E. Defendant Wigington

Defendant Wigington also moves for summary judgment on Plaintiff's supervisory liability claim against him. Like Nichols, Wigington was not present at the scene, and Plaintiff has conceded that the "Defendants' actions were not the result of an established policy or practice." Dkt. No. [51-1] at 7. Thus, the only way Wigington could be liable is if he directed his officers to violate Plaintiff's constitutional rights. Here, Plaintiff has produced evidence that Wigington told his officers to pick-up the Plaintiff. First, Plaintiff points to Greg's deposition in which he stated that Goodson told him that Sheriff Wigington had told Nichols that they were "sending some people down to pick Jeremy up."[3] Greg Dep., Dkt. No. [44] at 33; Pl.'s SMF, Dkt. No. [51-2] at ¶ 47.

---

[3]The Court recognizes that this is at least three rings of statements. However, as an initial matter, the Court notes that Wigington did not file a response to Plaintiff's Statement of Material Facts [51-2]. Thus, this fact is deemed admitted without objection. See LR 56(B)(3), NDGa (stating that if the respondent files a statement of additional material facts, the movant "shall" file a response); LR 7.1(B), NDGa (Failure to file a response shall indicate that there is no opposition. . . ."). But, regardless, the Court is not troubled as each statement was made by a party-opponent, and thus is not hearsay under the Federal Rules of Evidence. See FED. R. EVID. 801(d)(2).

Additionally, Plaintiff points to the police report which was written by Thomas Brewer, a Defendant in this matter. In that report, Brewer states that "Sheriff Wigington instructed Lt. Wolfe and myself to meet with Newton County Sheriff's Department and <u>bring Dial</u> to Rockdale County Sheriff's Office to be interviewed." Dkt. No. [51-3] at 4 (emphasis added).[4] Taking these facts most favorable to the Plaintiff, the Court finds that there is a factual issue as to whether Wigington instructed his officers to pick-up Plaintiff at his home without a warrant. And, for the reasons stated above, the Court finds that directing an officer to pick-up a person in his home without a warrant is clearly established. Thus, Wigington's Motion [42] is **DENIED** as to the supervisor liability claim against him.

## III. Conclusion

Defendants Sonny Goodson, Jason Griffin, Newton County, Joe Nichols, and Marty Roberts' (collectively, "Newton County Defendants") Motion for Summary Judgment [37] and  Defendants Rockdale County and Jeff Wigginton's Motion for Summary Judgment [42] are both **GRANTED, in part** and **DENIED, in part**. All claims are dismissed against Rockdale County,

---

[4]Wigington also did not object to this evidence.

AO 72A
(Rev.8/82)

Newton County, the individual defendants in their official capacities, and Defendant Nichols in his individual capacity. However, Plaintiff's Fourth Amendment claim remains against Defendants Wigington, Goodson, Roberts, and Griffin in their individual capacities.

**SO ORDERED**, this __26th__ day of March, 2012.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)